P. V. BARANOWSKY CO., LTD., Plaintiff, *v.* GUARANTY TRUST COMPANY OF NEW YORK, Defendant.

Supreme Court, New York County, December 13, 1934.

*Harding Johnson* [*Nathan A. Smyth* of counsel], for the plaintiff.

*Davis, Polk, Wardwell, Gardiner & Reed* [*Theodore Kiendl* and *Ralph M. Carson* of counsel], for the defendant.

STEUER, J. One of the early consequences of the war to be experienced in Russia was a shortage of foreign exchange. By 1915 it became apparent that regulatory measures for the control of whatever exchange was available were essential. To this end an elaborate and cumbersome machinery, consisting of several boards and commissions, was set up. The object was to insure foreign currency for governmental purposes. The means was for the government to secure all the foreign exchange coming into Russia and to allot it according to the urgency of the need. The method adopted required the interested government department to make application for permission to make any contract which called for payment in a foreign currency. If the proposed contract was approved, it could be made. When payments in the foreign currency were due on this contract, the Ministry of Finance provided the foreign currency and made the payment. A system of debiting the government department against its budgetary allowance was provided for. This machinery was also employed in instances where Russian individuals made application for the use of exchange.

The individual, however, had no budgetary credit to be charged, so he was required to pay roubles for the exchange he received. While individual applications were not rare, they were in the minority of the business handled and were not the type of transaction for which the procedure was designed.

Upon this scene appeared one Olaf Ashberg, with a plan for procuring a large dollar credit for Russian purchases in the United States. He brought his plan to Alexis Poutillof. The latter occupied a position of commanding importance in Russian business, being the president or holding an important place in the direction of over fifteen major Russian business enterprises, including the presidency of two which factor largely in this litigation. These were the Russo-Asiatic Bank and the plaintiff corporation, the latter being in the business of manufacturing shells and other artillery projectiles. Poutillof sponsored the Ashberg scheme before the Ministry of Finance and it was adopted. As finally developed in early September of 1915, the plan involved a loan by the defendant bank, discounting $5,000,000 of drafts drawn on defendant by the Russo-Asiatic Bank, the loan being repayable by the Russian government and secured by Russian railway bonds. A special account was opened in the defendant bank with the proceeds of the discount in the name of the Russo-Asiatic Bank, but the latter held the same subject to the order of its government. Further and complete details of interest, discount and the like were provided for and carried out. For his services Ashberg received the assurance that any purchases made in the United States with these funds were to be made through the agency of Ashberg's firm, the Swedish Russo-Asiatic Company.

At this time there was in effect a contract between the artillery department of the Russian government and the Poutillof Works (one of Poutillof's enterprises) for the manufacture and delivery of shells. The Poutillof Works, in turn, contracted with other firms, one of which was the plaintiff; plaintiff agreed to supply 3,000,000 shells. Plaintiff originally contemplated manufacturing the necessary powder, but its facilities were insufficient and efforts to increase them would take time. Meanwhile powder had to be bought. An order for $3,000,000 was placed with Union Powder Company. The proper governmental agencies permitted the use of the credit with the defendant and the contract was fully performed. The details of this transaction are not set out, as they reflect no real light on the questions here involved. Upon receipt of the final delivery, plaintiff had not yet acquired the means or the proficiency to supply its powder needs and a further purchase of powder was necessary to enable it to perform its contract.

Negotiations were opened in London, resulting in a contract with one J. Bradford Erb for 1,500,000 pounds of powder at $1.16 a pound, or a total of $1,174,000. Then plaintiff wrote the Russo-Asiatic Bank, as follows:

" DEAR SIRS.— Referring to our personal negotiations, we herewith request you to open for us a special account in the amount of two million (2,000,000) American dollars, which you are to receive from the Credit Chancellery at the rate of roubles (2.47) per dollar.

" On this credit we undertake to pay you seven and a half per cent interest and at the same time we pay you on the amount of four million nine hundred forty thousand (4,940,000) roubles one per cent interest for *del credere*.

" Simultaneously with this, we are requesting the Special Chancellery of Credit to furnish us with the above mentioned amount of dollars."

Plaintiff sent its request for the exchange at the same time to the Russo-Asiatic Bank, which forwarded it to the authorities in a letter informing them that the dollar account of the foreign department had been debited $2,000,000 and that a deposit of a corresponding sum of roubles had been made in the State bank to the credit of the foreign department.

The Russo-Asiatic Bank then wrote plaintiff:

" DEAR SIRS: Referring to your letter of the 4th February we beg to inform you herewith that we have to-day paid to the Special Chancellery of Credit the counter value of the 2,000,000. American dollars furnished you at 2.47

Rs. 4,940,000 which amount, plus

Rs. 25 telegram charges

Rs. 4,940,025 we have debited to your special account at 7-1/2% per annum with additional 1% commission, value this date.

" Simultaneously we have credited your account in American dollars with Am. $2,000,000, value to-day received by us from the Special Chancellery of Credit."

Erb meanwhile had become alarmed by the time taken up in the negotiations and insisted on a modification of his contract requiring a deposit by plaintiff in Erb's bank, the Empire Trust Company, of the entire purchase price. The modification was agreed to and plaintiff wrote the Russo-Asiatic Bank to effect a deposit of the amount in the Empire Trust Company, subject to withdrawal by Erb on presentation of proper documents. The Russo-Asiatic Bank cabled these instructions to defendant, who

withdrew the amount from the balance of the Russo-Asiatic Bank special account and made the deposit in the Empire Trust Company. The latter opened an account which it called documentary credit No. 25. At the same time the Russo-Asiatic Bank, on plaintiff's order, directed defendant to make a payment of $100,000 to Ashberg's New York representative, John McGregor Grant, Inc. This payment was in lieu of Ashberg's commission, as the Erb contract had been negotiated without employing his services. The time for Erb's delivery came, but no powder was forthcoming. In Russia there was dissatisfaction with the manner in which the Poutillof Works was performing under its contract, and a government agent was placed on its board with supervisory powers. Plaintiff's affairs came under his scrutiny, and the Erb contract with its exorbitant price attracted immediate attention. When the default occurred, cancellation was suggested and Erb was so notified. Erb claimed a breach by plaintiff and attached the funds in the Empire Trust Company. Erb's claim was for $600,000 and negotiations were begun for the release of the balance of the deposit. The Empire Trust Company insisted on definite instructions from all parties known to it in the transaction. Both plaintiff and the Russo-Asiatic Bank had representatives in New York at the time and they joined in a letter to the Empire Trust Company to the effect that the money belonged to plaintiff and that the Russo-Asiatic Bank disclaimed any interest in it. The Empire Trust Company then gave plaintiff a check for the amount, which plaintiff deposited in defendant bank, and with this deposit a new account was opened in plaintiff's name.

This situation prevailed for a short time, during which the Grant firm produced prospective sellers of powder. These overtures were met by a curt communication from Russia that plaintiff was not in the market. Almost immediately thereafter, defendant received instructions from the Russo-Asiatic Bank to place the funds in plaintiff's account to its credit in the special account. These instructions were obeyed. This transaction was reflected in the books of the Russo-Asiatic Bank by a credit to plaintiff's dollar account, but no change was made in the rouble account.

Later the Erb attachment was vacated. The same procedure was adopted with regard to the funds which had been held except that prior to the transfer from plaintiff to the Russo-Asiatic Bank two checks of plaintiff to cover the expenses of the Erb litigation were drawn by plaintiff and honored by defendant.

Subsequently defendant made two disbursements out of this account on instructions from the Russo-Asiatic Bank. One was a transfer of $600,000 to the account of the Azof-Don Bank, and the

other was a payment of $40,000 to one Dunaijeff, an agent of the plaintiff in New York. Both of these payments were for plaintiff's purposes.

There remains a balance of $1,041,570.61 in the account, and for this sum, with interest, plaintiff brings suit. Defendant disputes plaintiff's right, upon the ground that the Russian government never transferred the account to plaintiff or to any one else. Defendant urges that the government gave permission to use Imperial funds for a specified purpose, and while it may have intrusted them to plaintiff or its banker until payment was due, it required return of the funds in the event they were not used as intended. A similar contention was held unwarranted in *Lewine* v. *National City Bank* (248 N. Y. 365), but the court did not in that case have the benefit of much of the evidence submitted on this trial. On this trial copious testimony was taken of the workings of the Valuta Commission, the Credit Chancellery, the Supreme Council of the Defense of the Realm, the Powder Committee and the Ministry of Finance. The additional testimony does not change the result.

The control exercised by the government boards was effectuated by limiting original awards of foreign exchange to such contracts as were approved and by retaining the exchange itself until the date of payment. These measures do not indicate an intent to retain any part of the title to the foreign exchange involved after it was transferred. On the contrary, they are indicative that the government satisfied itself of the propriety of an expenditure before releasing title. Proof offered to show a practice of recalling unused exchange was shown to be restricted to transactions of the departments of the government itself, or was so unsatisfactory as not to merit credence. Conversely, no regulation, bulletin or instruction, no written or printed matter, contains any restriction on the exchange allotted. Accordingly, it is concluded that no restriction existed, and when the government released exchange it parted with the full title. Furthermore, as above pointed out, this was not the usual transaction. As the quoted correspondence reveals, the permission must have been granted in advance of the formal application. This indicates that the normal practice and its consequences cannot be a sure test for this transaction. The dealings with the Credit Chancellery were so extraordinary that the clerk who filled out the papers remembered doing so fifteen years after the event. Unfortunately, that was the only detail concerning this transaction to which any trustworthy recollection clings.

The transfer of the exchange by the Credit Chancellery was not shown to have been made by any writing. For all that appears, the Russo-Asiatic Bank and the Chancellery of Credit regarded

the special account with defendant as paid for by the roubles which it had advanced to the State bank and charged against the plaintiff.

Referring again to the two quoted letters, it will be seen that plaintiff requested and received a credit of dollars in Petrograd from the Russo-Asiatic Bank. No doubt, plaintiff and the bank expected that disbursements from the account in Petrograd would be made through the release of the funds in New York. It may also be taken as the fact that the Russian government expected that any funds that it released would be used by plaintiff. Yet the dealings between these three parties show that the Russo-Asiatic Bank took the funds in New York, and it is quite clear that at this moment the Russo-Asiatic Bank owed the plaintiff $2,000,000 in Petrograd, which was payable on demand out of any dollars the bank chose to use for that purpose and that plaintiff acquired no rights in any particular account owned by the bank. Aside from the language employed in plaintiff's letter of February 4, 1916, to the bank, other factors indicate that this was the fact. Among such factors are the following: At the time of the opening of the dollar credit, the Russo-Asiatic Bank special account with defendant did not contain $2,000,000. (The original $5,000,000 had been reduced by the $3,000,000 spent on the Union Powder Company purchase and by the discount on the drafts which opened the account.) The dollar account in Petrograd did not reflect the bank's account in New York, as the Petrograd account was charged with cable costs and banking charges disbursed in Russia and having no counterpart in New York. The Petrograd account was used for transactions other than the powder purchases here involved, notably for the purchase of factory equipment in Switzerland, which expenditure in no way involved the account with defendant. It was stated that the Petrograd dollar account was a " position " account. If by that is meant that this account showed the status of the account in New York, the claim is unfounded for the reasons indicated.

It may appear strange that the object of the applications to the Credit Chancellery was to obtain certain dollars for plaintiff, and the result finds the dollars belonging to the Russo-Asiatic Bank. The strangeness disappears when it is remembered that Poutillof was president of both and personally did the actual negotiating which obtained the dollars.

The next step — the advance to the Empire Trust Company of $1,740,000 — did not change the relationship of the parties to the funds. Plaintiff at this point requested its banker to establish a banker's credit in New York, and it was done. Such a credit gives

no title to the funds to the person directing the opening of the credit. Upon the breakdown of the Erb transaction and the release of the funds by the Empire Trust Company, another question arose. At that time the evidence shows that the Russo-Asiatic Bank chose to regard the deposit in the Empire Trust Company as the property of the plaintiff. It may be argued that this interpretation dated back to the time of making the deposit, and while this claim may be tenable, it is unnecessary to discuss it. Defendant claims that the admissions by which the attitude of the Russo-Asiatic Bank was proved were unauthorized. As regards the letter signed by Herzenberg, the bank's officer in New York, this is probably true. There can be no doubt, however, that the bank acquiesced in the action taken. It is further claimed that the purpose of the admissions was to create an estoppel in favor of the Empire Trust Company to secure the latter against claim by the Russo-Asiatic Bank, and that they did not show an intent to acknowledge a transfer of the account to the plaintiff. Had this been the case, it would have been just as easy to reassure the Empire Trust Company by a disclaimer from the plaintiff and to have had the Empire transfer the funds to the Russo-Asiatic Bank.

The conclusion reached is that the account opened in the plaintiff's name with the defendant belonged to the plaintiff. It was so treated by all concerned. The account was, however, transferred to the Russo-Asiatic Bank. Plaintiff criticizes defendant's banking practice in doing this without clearer authorization from plaintiff. As a matter of banking practice, the criticism is, perhaps, tenable, but as a factor in the case the absence of authority is without significance. Poutillof, testifying for plaintiff, claimed the transfer was made for plaintiff's convenience and admitted it was made with its consent. He gave as a reason for the transfer that the account would be more accessible if held in the name of the Russo-Asiatic Bank. Mabille, an officer of the bank, contradicted this statement and assigned as the reason for the transfer that the bank demanded this account for security for plaintiff's rouble indebtedness to it. Neither contention is borne out by the documents and subsequent transactions, which indicate the true explanation. The dollars were paid by plaintiff to the Russo-Asiatic Bank and recredited by the bank to the dollar account in Petrograd. This appears plainly in the bank's books. If only the name of the account in New York was changed without a corresponding change in ownership, a credit in the Petrograd dollar account would be improper. The later transactions, chiefly the sale of $600,000 to the Azof-Don Bank, the payment for which remained as a deposit in plaintiff's favor in the Azof-Don Bank, negative the contention

that the dollars were being held as security. Plainly, then, the situation which began at the time of the transfer and continued to the present, is that the dollars in New York belonged to the Russo-Asiatic Bank and that bank owed the plaintiff dollars in Petrograd — not the same dollars, nor even the same amount. Defendant owed and owes the plaintiff nothing.

Defendant also urges that plaintiff has lost its juristic personality through the nationalization decrees of the Soviet. These decrees are not given extraterritorial effect in our courts despite the recognition of the Soviet. (*Vladikavkazsky R. R.* v. *New York Trust Co.*, 263 N. Y. 369.) Further, defendant claims that under Russian Imperial law plaintiff has ceased to exist because it has been unable to function properly, to hold the requisite meetings and the like. This claim has been advanced in virtually every case brought by a Russian corporation since the Bolshevik revolution, and has still to meet success. In deference to the opinion of the learned gentlemen who testified to the effects of Imperial law, it must be concluded that the Russian corporation is a plant which becomes more tenacious of life when transplanted than when allowed to remain in its native soil.

The answer to one of the points raised was sufficient to dispose of this litigation. Discussion of the other contentions of the parties has extended this memorandum appreciably. These additional points were gone into at the request of all counsel, made for the purpose of avoiding the tedious practice of proposing findings. The intelligent, able and professional manner in which the facts were presented and the law argued, has merited acquiescence in this request.

Verdict directed for the defendant, with exception to the plaintiff.